Good morning. My name is Patricia Federle and I represent the appellants who are the individual defendants Mary LaFond and Norm Webster who are former administrators of Child Study and Treatment Center. I would like to reserve three minutes of my time for rebuttal. We are asking this court this morning to reverse the decision of the district court which denied qualified immunity to the individual defendants and order that those be submitted to trial. Our position, your honors, as set forth in our brief is that there is no evidence of conscience-shocking behavior that would support claims of substantive due process against the individual defendants. The appeal does not affect the claims of negligence against their employer, the Department of Social and Health Services which operates the facility. Those remain pending below. What if we disagreed that conscience-shocking was the appropriate test here and we thought it was something more akin to deliberate indifference? What difference would that standard make? I don't believe, your honor, that it would make a difference because the plaintiff cannot establish deliberate indifference here because there is simply not evidence of the subjective knowledge of the specific harm and deliberately ignoring the specific harm. The issue before you is what cases do you have that suggest that subjective knowledge is required? The Lewis case, your honor, makes it quite clear that deliberate indifference is the minimum standard. Yeah, although I'm not sure that that really discusses the question of subjective intent and that's a motorcycle chased by police. It really doesn't seem to apply to our case particularly well. The facts in that case were a police pursuit which the judge, on pages 848 and 849 of that decision, Justice Souter stated that the minimum standard is deliberate indifference. And then we have the Farmer v. Brennan case which is to establish deliberate indifference. The state officer must be consciously aware of the specific danger and draw the inference of the harm and make a conscious decision not to intervene. And that is about the reliance by Mary LaFawn on the finding of the state agency charged with investigating allegations of child abuse that the 2001 allegation against this employee, Anthony Grant, was unfounded because it simply does not meet that standard of either deliberate indifference or conscious shocking behavior. Counsel, let's look at what the Supreme Court has said. In Youngberg, they look to the reasonable performance of the professional. And how do we equate that here? Youngberg established that deference is to be made to the judgment of the professional. In this case, the deference involved was to the finding of the child protective services investigator that the state agency charged with investigating allegations of child abuse that the employee, Anthony Grant, was unfounded. That, Your Honor, it maintained, meets the Youngberg standard because it shows the exercise of professional judgment. In order to violate the standard of professional judgment, it must be evident that the state officer exercised no professional judgment. No, we look to see whether what he did exercise was reasonable. I would respect to disagree that the standard, which is what the district court said was the standard, is reasonableness. In doing so, the court, the district court relied on the Neely decision, which was questioned by this court the following year, and in the Grubbs decision, which established that, again, deliberate indifference, subjective intent to harm was required. And then we have a guidance, again, of the Lewis decision. Also, in the Youngberg decision, the context of the exercise of professional judgment was in the issue of appropriate, the minimum standard of training and education for the developmentally disabled plaintiff. Here we have an issue of safety. It simply is the position of the appellants that it does not shock the conscience, does not rise to a standard of deliberate indifference, for the administrators to have relied on the earlier finding that the earlier allegation was unfounded, which under Washington law. There were other facts in the record that might have, or at least the plaintiffs have alluded to other things, that might have called a diligent administrator or counselor of some kind, whether it reaches to Lafond or not, it might have caused some attention. There are claims that there were posters up expressing undying love and admiration for Mr. Grant, that these were things that somebody should have noticed and said, hey, what's going on here? But again, Judge Bybee, with respect, the standard is not what they should have noticed. It is what they, the objective facts in front of the administrator that they could not ignore. The record is quite clear. But counsel, could they ignore those things that Judge Bybee notes, plus the things that everybody was noticing and commenting on? The record, and that would be at the declaration of the psychiatric social worker, Ms. Hernandez, which is in the record at page 327, and also of Dr. Fletcher, that there may be such art, so-called artwork or evidence in the cottage that Judge Fletcher was referring to. Why didn't they, I wonder? Why didn't they? In a 48-child facility, why would not the administrator and the doctors and so on have occasion at some point to walk through and look at the rooms? Or look at the file. There were multiple file references in her file. I would dispute that, Judge Wilk. And the record shows that there was one prior allegation against this employee. No, no. In Crystal's file, indicating that she lacked boundaries, that she had this relationship with Grant, et cetera. That was known by the treatment staff. Again, that knowledge has to be known. We're not talking about the negligence claims here. That knowledge has to be known expressly by the administrators. It's not sufficient to impose liability on the supervisor, on the superintendents, to impute knowledge from their staff to them that they might have. Was Ms. Hernandez in the cottage every day? Was that her assignment? Ms. Hernandez, yes, was the psychiatric social worker assigned to the cottage. How many people would have worked in this particular cottage? Given all shifts, Judge Biby, probably 20 approximately staff, if you talk about the 24-hour covering of the shifts, plus the treatment staff. How many cottages were there? Three. But the evidence is very clear that Ms. Hernandez and Dr. Bacon made a conscious decision not to report this to the administrators. What about Rutherford? I know that most of what she said was referencing patient-to-patient sexual conduct, but wasn't there some mention of staff on patient abuse? Not of sexual abuse. Only physical abuse. There was physical abuse, which it's very clear at Ms. LaFawn's declaration, and that's in the record at page 24 and 25. Ms. LaFawn followed up on that, took disciplinary action against that school district employee that was contracting with the center. Ms. Rutherford stated in her deposition testimony, and that is at page 50 and 51, that she never warned Ms. LaFawn of any danger of sexual abuse from staff. And there were only two allegations of sexual abuse by staff on patients in the eight years that Mary LaFawn was the administrator. And that one of these was AC's allegation. Both of these were determined to be unfounded, and that's at page 27 of the record. What were Ms. LaFawn's duties? If she didn't look at patient files, didn't watch employees work, didn't look at residents' rooms, what were her duties? Ms. LaFawn's duties were to set policies and procedures, which she did. She increased the safety provisions within the institution. She instituted key control. She instituted alarms and cameras in the hallways. She required staff to sign out when they left the cottage with the residents. Do we have any evidence as to whether Ms. LaFawn walked the cottages every day? As she indicated in her declaration, she regularly attended meetings with the treatment team and regularly visited the cottages. Did she have meetings one-on-one with students? Was she responsible for interviewing them or conducting a periodic review with individual students? Not on a regular basis. That was not part of her responsibility. She was not part of the treatment team. Her responsibility was for the overall administration of the facility. How many employees did she supervise? Ninety. She supervised 90 employees and about 48 patients. Approximately 48 patients, yes. And again, there's a confusion here, I think, between her administrative responsibilities, for which she could be responsible for the actions of her employees, and imposing constitutional violations upon her, substantive due process violations. For that, she has to have specific knowledge of the specific danger herself. It's not enough, as this court recently said in the Simmons case, which is cited in our brief, that supervisor liability is a misnomer, that you have to show individual conduct, deliberate indifference on the part of the individually named defendants. It is simply not enough to say the subordinate did something wrong. Since you are their supervisor, you are the administrator, is therefore responsible. I would briefly like to... I guess the question is whether she had an obligation for a closer observation of the students. She did, the record is clear, she did attend meetings of the treatment teams, and she also supervised the employees. She reprimanded Anthony Grant in 2002 for misuse of sick leave. She saw that those employees were evaluated. She took those evaluations seriously. She was not ignoring either the residents or ignoring her staff. But like any facility, she works, they would work through supervisors, and she's entitled to rely on what others who directly supervise... Who would have been in charge of the cottage where Crystal Ammons was? As far as the treatment staff? Well, do we, what's the hierarchy that, who would be ultimately responsible for that particular cottage? There are essentially two chains of command. The treatment staff, the person in charge of the treatment was Dr. Bacon, the staff psychologist. There were the child care counselors, of which Mr. Grant was one, reported to a cottage supervisor, who then reported to another administrator who reported to Ms. LaFawn. But once again, in 2002, when Ms. LaFawn knew that Anthony Grant had violated the rules by misusing sick leave, she reprimanded him. So she was not ignoring her responsibility. And who was the supervisor of the cottage? Of the name of the supervisor within the cottage? That's not Ms. Hernandez? No. Ms. Hernandez reported to Dr. Bacon. She was part of the treatment staff. I don't believe the name of the actual supervisor of the residential staff was in the record. There was a mention of Mr. Grant's immediate supervisor, who was interviewed as part of the earlier investigation that AC made. But where does the director of nursing fit in? And that was Mr. Webster's role during the earlier months of the abuse. He was the temporary director of nursing. He didn't assume his duties as chief executive officer until April 1st. Prior to that, what was his role in the hierarchy? The director of nursing basically supervised much of the treatment staff, which would be the psychologist, the other nurses within the cottage, and then ultimately reported to the medical director. But again, there's... He would have supervised Bacon, yes? Not directly, but to a certain extent, yes. And reported to... The director of nursing would have reported to the medical director, who was not the administrator, as in any hospital, is separate from the administrative staff. There's been a bit of a dichotomy set up between Grant's rights and the fact that Grant could not be fired if his investigation found that he was not at fault, and Crystal's rights. My question is, could not something have been done that would not have been disciplinary to Grant, but would have provided more oversight of Grant without interfering with his employment rights? Well, he was still subject to the same rules and procedures. He simply violated them. He was still overseen, and he... And after 2001, true, they couldn't fire him because it was found that the charges were unfounded, rightly or wrongly, they couldn't discipline him. But could they not have watched him more closely, assigned him more carefully, something like that, to protect against the possibility that even though it wasn't clear enough to fire him, it still could have been a problem? He could not have had his duties changed, for example, because... No, I'm asking, isn't there something that could have been done to watch him more diligently? And he was, I would maintain, because he was reprimanded a year later in 2002 for not following the rules for violating sick leave. So he was not ignored. And as Ms. LaFawn points out in her declaration, which is in the record, that she simultaneously with the CPS investigation, she talked to his supervisors, talked with people that interacted with him daily, and that there was no reason for her to suspect once the allegation was determined to be unfounded, and once her own investigation took place, that he remained a danger to residents. We would have had a very different situation, of course, had the determination been founded. It simply does not meet the standard of deliberate indifference to shock the conscience for her to rely on the determination by the CPS investigator, the person charged by law with making those investigations, that the earlier allegations were unfounded. Without knowledge of that danger, the case falls. The other issues go to the negligence claims against the Department of Social and Health Services, not the personal subject due process claims against the individual defendants. Thank you. Mr. Moody? Yes. Good morning, Your Honors. David Moody on behalf of the appellee, Crystal. We're talking about a lot of facts here. At page one of the appellant's brief, they claim that they're not talking about the facts. That's why they're entitled to bring this in an interlocutory fashion, subject to the collateral order doctrine. I'm happy to talk about facts with you. I wouldn't spend a lot of time on the collateral order doctrine. I'm eager to talk about the facts. What I'm most interested in actually from you is what facts you have on Webster. What facts relate to Webster get back to what the standard is for these hospital administrators? As Judge Fletcher asked in her questioning, and Judge Wilkin, I think you also asked, what were the duties? The duties, as we know from the United States Supreme Court in Youngberg, which specifically addressed a state mental institution, and that this court followed in Neely in 1995, which specifically dealt with a state psychiatric hospital, just like Youngberg, is that the hospital administrators must exercise their professional judgment. Part of exercising professional judgment is ensuring patient safety. I'll get to Webster in just a moment. I apologize. On the collateral, on the appellate jurisdiction, I'm speaking for myself. The other judges may certainly want to hear about that. I apologize. Judges Bybee or Fletcher want to know about the collateral order doctrine. We'll talk about that too. No, I really am interested, as is Judge Wilkin, in exactly what Webster did, what his role was, when he came, when he left. Let's do it chronologically. I'll do it from left to right for you. We start here when Crystal was found to have been raped for the very first time. I think, as a backdrop, it's important to embrace this very long, long period of time that they found that Crystal, as a 13 and 14-year-old, was being raped at this facility. Let me quote the dates, and then we'll get into who played what role during those dates. These defendants found that, and this language is unvarnished, between January 1, 2003, and April 18. We know that. But if you could focus specifically on Webster, what did he know, and when did he know it? On January 1, 2003, LaFond was the CEO. Webster was the director of nursing. Correct. It is a two-person executive team. They are at the top. I thought there was a medical director. There's a medical director too, but from the testimony of Mary Rutherford, she talks about how the director of nursing, and she predates this, and the CEO are the two top dogs. Those two parties, LaFond and Webster, were in charge at the Child Study and Treatment Center, a state-operated psychiatric hospital, starting in January of 2003, during this period of abuse. At the end of March, CEO LaFond resigned or retired, and Webster became the CEO. Crystal was being raped for two and a half weeks while Webster was the CEO, and three months prior, when he was the director of nursing. Now, the court in Romero v. Kitsap County here in the Ninth Circuit from 1991 tells us that if the right is clearly established, and the right to patient safety at a state psychiatric hospital has been clearly established in this country since 1982 in Youngberg, and in this circuit since 1995 in Neely, if the right's clearly established, the burden shifts to Webster to demonstrate precautions taken to ensure patient safety. Webster took no precautions whatsoever. There's not even an attempt in the record for Webster to show what precautions he took. Where are you getting that language? His burden is to show that a reasonable person in his position took precautions, and he did not take any precautions. Where are you getting this taking precautions language? From Romero v. Kitsap County, Ninth Circuit, 1991. On his watch, just as CEO, Crystal was raped repeatedly for two and a half weeks while he was in charge of patient safety and supervising the male employees. Counsel, that sounds like strict liability. No, it's not. Tell me why it's not. In Youngberg, they ask that this court apply a professional judgment standard. What were the duties? Both defendants, and you can find this in the record, were responsible for ensuring patient safety, for supervising staff, for ensuring that staff followed policy, and for ensuring that there be no sex with the pediatric patients. That's directly from the record at S.E.R. 45. And what is that that you're quoting from? I'm quoting from the deposition of Mary LaFond when asked about the duties of the CEO at the hospital. DeShaney tells us, and Youngberg tells us, that it is an affirmative duty to protect these patients while they're in state care. It is an affirmative duty. Willful ignorance is no excuse to the civil rights violations in this narrow context, the context being a state psychiatric hospital. So what should Webster have done that he didn't do? Webster should have done what the Ninth Circuit required Feinstein to do in Neely. In Neely, there were two complaints. Right. Isn't Hosley more analogous to Webster and Feinstein perhaps more analogous to LaFond? In Neely, there was one isolated incident of abuse that led to the claim. Here, the CEOs admit that this is a small facility and it's, quote, not difficult, unquote, to monitor the staff. Neely says that a reasonable official, if you're going to affirmatively protect the safety of your clients, would have, quote, made clear in writing a directive that prohibited the male staff member from working with female patients and, two, would have implemented appropriate procedures to ensure that he or she would be informed of any changes in that directive. But Webster didn't know about the Grant Institute incident. Webster, as a person in charge here at the facility, should have known about a constellation of warnings about Mr. Grant. The appellants focus on the allegation in 2001, which in itself is shocking. We've got a 13-year-old girl who's alleging that the male counselor is sexually abusing her time and time again for weeks. But there are many, many other instances and indications that Grant is not performing and is a dangerous person for female staff members. I'm going to come back to Judge Wilkins' question because I don't feel like it's been answered, and it's my question as well. I'd like to answer it. What should Webster have done? And you're telling me that he should have written more policies? No. He should have opened his eyes, Your Honor. He should have seen the posters and the love letters. And he should have seen the posters and the love letters because why? He had an obligation to be in everybody's room? They were up all over the cottage. The testimony from Jessica Ramsey, which you will find at SER 91 through 95. I find it very curious here, Counsel, if that's the case, that you haven't sued everybody in sight here, including Hernandez and Bacon and other people who were in those cottages every day. You only sued the two people at the top, and it certainly sounds like a respondeat superior claim, when you didn't sue the people who were in the cottage every day dealing with Crystal. Before bringing this claim, Your Honor, we took a hard look at everyone who was involved in this case, and we also took a hard look at the case law. The case law from Youngberg and then this Court's decision in Neely instructed us that the hospital administrator, as the Ninth Circuit found in Neely, was the appropriate party here, that the hospital administrator had the ultimate responsibility to know what was going on in the hospital and to use professional judgment. I think it would have been irresponsible for us to make a scattershot complaint where we sued everyone we could possibly think of that was noted in the case file. There are many, and perhaps Ms. Hernandez should be a defendant, and possibly Dr. Bacon. But here at this hospital, the CEOs have testified in depositions that they were the ones responsible for patient safety. Counsel, you started to tell us what we would find on pages 91 to 95. Yes. Would we find that there were posters not only in Crystal's room but in other places? Yes. You're going to find in S.E.R. 91 through 95 the declaration of Jessica Ramsey that not only were there posters in the rooms, there were love letters being sent throughout the cottage, and that's not all, Your Honor. This wasn't just a few love letters. These things would really make you blush. The attachments to the declaration are graphic. In addition, the declaration... Who had these love letters? Where were they circulated? They were in the wing at the CSTC. They were on the walls of the patient's room. They were in Grant's personnel file. And Grant didn't just send love letters. He gave the female patients gifts, he gave them photographs, and he gave them Valentine presents. This was a staff member who was sexually grooming young female pediatric patients, and both Defendant LaFond and Webster had a duty to use professional judgment to ensure patient safety. The foster mother expressed multiple concerns about Grant. Okay. Who did she talk to? She talked to Ms. Hernandez. Okay. Did Ms. Hernandez ever communicate that to Ms. LaFond? It's not apparent that she did. Okay, but that would be your obligation to come forward and show that she did. Did you depose Ms. Hernandez? I did depose Ms. Hernandez. Did you ask her that question? I did. And what did she say? She said she did not relay these to the CEO. Then how is Ms. LaFond supposed to know this if Ms. Hernandez is not telling her that? What we're trying to establish, Your Honor, here is a consolation of warnings that if professional judgment would have been used, any one of a number of these warnings would have... What professional judgment should Ms. LaFond have used that would have teased out of Ms. Hernandez reports from a foster mother that Ms. Hernandez did not think were important enough to tell the CEO? I believe she could have asked her point blank, is there any problem? How is Crystal doing? Have there been any complaints? How is the foster mother communicating with Crystal? And it's a violation of the Constitution if she fails to do that and somebody gets hurt. Your Honor, I don't mean to put that fine of a point on this. It's a pretty fine point, but I think it's probably critical to your case to be able to come to that point. I think it's critical to the case that there were earlier allegations against this specific staff member. That there was a letter of reprimand to the staff member that talked to him about violating safety risks. That in the record, which is not discussed by the appellant at all, at SER 137, quote, Mr. Grant had several CPS investigations, CPS stands for Child Protective Service, investigations while employed at the CSTC. Several. Now who stated that? DSHS did. It's in the records from the defendants themselves, SER 137. What could have been done more diligently to supervise Mr. Grant without being able to fire him or discipline him, given that his investigation came up unfounded? The same thing that this Court found in Neely would have been appropriate. To prohibit him, at a minimum, from mixing with the female patient population. That seems to me like an obvious remedy after the constellation of warnings, the several CPS investigations, and at SER 149, the pattern of incidents, unquote, regarding Grant. Were the cottages sex segregated? Could he have been assigned to a boy's cottage?  And that's exactly what the Ninth Circuit found in Neely, that the administrator, and again, in that case, there were two allegations, both that were deemed unfounded, and the administrator relied on the fact that those were unfounded, and the Ninth Circuit said, when you're in a setting like this, when there's a special relationship, when you have vulnerable psychiatric patients, you must take affirmative steps to protect patient safety. And the Ninth Circuit says that that includes prohibiting the staff member who's male from working with the female patients. That sounds very reasonable. And implementing procedures to ensure that that person remains separated. Here, the record shows that Webster and LaFawn weren't paying any attention whatsoever as he gave gifts to these girls, groomed them, gave them love letters, the posters were up all over the wall. The record shows that there were several CPS investigations about this, just this one employee. He was a very bad apple. And I want to go back to the 2001 investigation when the 13-year-old came forward and said she was being sexually abused. The duty right then and there was for the CEO, LaFawn, who had absolute knowledge of that, to call the Washington State Patrol. That's the law in our state, and she failed to do so. What she did was an internal investigation, and despite acknowledging that that patient was not recanting her allegations, closed it. Why wasn't it sufficient for her to call CPS? As I read one of Ms. Rutherford's letters, she adverted to the fact that when there were, and she was referring to a different incident, that they had failed to call CPS and that that was the appropriate response. So where does the obligation come to call the Washington State Police? There's two obligations, Your Honor, to call CPS, but CPS is just a division of DSHS. That's the same division that runs the hospital. The obligation is to call the Washington State Patrol because it's an allegation of a crime against a child. When asked in her deposition, and this is in the record and in our brief, LaFawn admitted that it's appropriate and necessary to call law enforcement. You don't just do an internal investigation. You go outside because this is an allegation of a crime, sex against a child. That was never, ever done. When Crystal came forward with her allegations and her foster mom said, I'll be calling the police when I hang up the phone, they called the police and they did the right thing. Way back in 2001, they didn't. It was deliberately indifferent not to call and get independent eyes and ears in at an early stage. Because they didn't do that, he was allowed to remain in this hospital and the warnings continued to mount, including, as DSHS says itself, several CPS investigations and a pattern of incidents, which all lead to this young girl being raped on this small facility where it's not difficult to monitor staff members for a period of 107 days. It defies logic to believe that these administrators were exercising professional judgment if one of their only 48 clients was getting raped repeatedly at that small facility. We ask that you affirm the decision of the district court. Thank you, Mr. Moody. Your Honors, I would take issue with Mr. Moody's last statement about Washington law and the obligation of reporting. Washington law is quite clear. In RCW 26440301A, as an employee of the department, the obligation of Ms. LaFond was to report allegations of abuse or neglect either to the department, meaning DSHS, Division of Child Protective Services Division, or law enforcement. Even if it's a crime? Yes, or law enforcement. That is what the statute says. The obligation to only report to law enforcement is for employees, another section of the statute, employees of either for-profit or non-profit entities. But the Child Studies Center would be a state agency and as an employee of the department, the reporting requirement is to either law enforcement or CPS. That is what she did in 2001. That was an outside investigation. It was done by and the determination made by Evane O'Donohue, the CPS supervisor, that there was not sufficient evidence that the allegations were unfounded. Ms. O'Donohue's declaration, and as records custodian, four of the allegations made at the record, page 295, there were two allegations against Anthony Grant total, the one in 2001 and then the later one involving the plaintiff in 2003. There were not several known to Ms. LaFond or Mr. Webster. There was one. I think there were two complaints about Angelica. Two separate incident reports, but the same incident, yes. There were two reports, but they're of the same victim, the same incidents. Multiple incidents. The same incidents. Two reports. One was a report from a resident of the same incident because Angelica told her about it, and then the staff member who received that report made a report. Those are one incident concerning Anthony Grant. Multiple incidents with regard to Angelica. Yes, but one report. One report, yes. Two reports, one victim, multiple incidents. But one investigation in which it was determined by the outside investigator that it was unfounded, the investigator charged by law with making these determinations. Now, as far as Mr. Webster, he didn't know and could not have known about the unfounded allegation, either when he took over as temporary nursing director or when he took over as the administrator in April 1. The record is absolutely clear in his declaration at page 340 that the first time he heard about the danger from Anthony Grant was when Mr. Hernandez and Mr. Bacon came to his office on May 21, 2003, after they received the telephone call from the foster parent. Counsel, you may want to wind up here, nearly four minutes over your time. Yes, that's when he learned of the earlier investigation. There's absolutely nothing under a reasonableness standard for Mr. Webster. As concerns Ms. LaFond, her reliance on the 2001 determination that the allegations was unfounded is justified. That shows the exercise of professional judgment. She did not ignore Anthony Grant after that. He was subject to all policies and procedures. He simply ignored them. To hold her liable for his actions would be to impose supervisor liability just because she was a supervisor, and this Court just said in the Simmons case that that does not show deliberate indifference. Thank you. Thank you. These are tragic cases, and we appreciate the insights of both counsels well argued today. We appreciate all counsel's arguments today. And with that, the Court has completed the oral argument calendar, and the Court is adjourned.
judges: Wilken, Fletcher B. , Bybee